# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 98-1649
No. 98-1741

———————

| | | |
|---|---|---|
| PaineWebber Group, Inc.; | * | |
| PaineWebber, Inc.; Mitchell | * | |
| Hutchins Asset Management, Inc.; | * | |
| William J. Reik, Jr.; | * | |
| William D. Witter, Inc., | * | Appeals from the United States |
| | * | District Court for the Eastern |
| Plaintiffs - Appellants, | * | District of Missouri. |
| | * | |
| v. | * | |
| | * | |
| Zinsmeyer Trusts Partnership, | * | |
| | * | |
| Defendant - Appellee. | * | |

———————

Submitted:  January 14, 1999

Filed:  August 16, 1999

———————

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

———————

LOKEN, Circuit Judge.

Zinsmeyer Trusts Partnership ("Zinsmeyer") submitted claims of securities fraud and market manipulation to an arbitration panel of the National Association of Securities Dealers ("NASD").  After a lengthy hearing, the arbitrators dismissed all of

Zinsmeyer's claims. The appellants in this court -- PaineWebber Group, Inc.; PaineWebber, Inc.; Mitchell Hutchins Asset Management, Inc; William D. Witter, Inc.; and William J. Reik, Jr. -- commenced this action by filing motions to confirm the arbitration award. Zinsmeyer responded by moving to vacate the award. The district court vacated the award in favor of appellants on the ground that it was procured by undue means within the meaning of the Federal Arbitration Act, 9 U.S.C. § 10(a)(1), because PaineWebber withheld four allegedly privileged documents from discovery during the arbitration. Appellants challenge that ruling on appeal. We reverse.

## I.

Zinsmeyer is a family partnership that invests the assets of various trusts. In 1986, Zinsmeyer entered into an investment advisory agreement with Mitchell Hutchins Asset Management, Inc. ("Mitchell Hutchins"), giving William J. Reik, Jr., a Mitchell Hutchins managing director, discretion to invest a portion of Zinsmeyer's total assets. Mitchell Hutchins is a subsidiary of PaineWebber, Inc., which in turn is a subsidiary of PaineWebber Group, Inc. We will refer to the three companies collectively as "PaineWebber." In February 1991, after Reik resigned from Mitchell Hutchins and took a position with William D. Witter, Inc. ("Witter"), Zinsmeyer retained Witter as investment advisor for the assets previously managed by Mitchell Hutchins. Dissatisfied with his performance, Zinsmeyer fired Reik in August 1993.

In February 1994, Zinsmeyer filed an arbitration claim with the NASD against PaineWebber, Witter, Reik, and others, alleging federal securities law violations, common law fraud, breach of fiduciary duty, breach of contract, and negligence. A panel of three arbitrators held thirty-eight sessions between March and November 1995, hearing evidence regarding Zinsmeyer's claims that Reik engaged in illegal market manipulation and other wrongdoing that caused large losses in Zinsmeyer's accounts controlled by Reik. The panel entered a final order dismissing all of Zinsmeyer's claims on November 30, 1995.

The arbitration proceedings included a major document discovery dispute over PaineWebber's claims of attorney/client and work product privilege. In 1990, a senior PaineWebber compliance officer had conducted an internal investigation of Reik's trading activities at the direction of in-house PaineWebber attorneys. In response to Zinsmeyer's document production requests in the arbitration, PaineWebber produced thousands of documents but objected that documents generated during its internal investigation of Reik were privileged. PaineWebber provided Zinsmeyer a log describing each allegedly privileged document and identifying its unique "Bates stamp number." The 347-page privilege log contained nearly 2000 entries.

In December 1994, Zinsmeyer filed a motion challenging PaineWebber's assertions of privilege with respect to each document listed in the privilege log. The arbitrators initially ordered production of all the documents for *in camera* review, but when Zinsmeyer identified seventy that it wanted reviewed, the panel ordered those seventy produced, and they were reviewed *in camera*. After the arbitrators ruled that all but a few were privileged, PaineWebber produced those ruled not to be privileged.

In March 1995, PaineWebber produced an additional file created by the compliance officer during his internal investigation of Reik's trading activities. PaineWebber removed documents considered privileged and replaced each with a blue sheet containing the document's Bates stamp number. In May 1995, Zinsmeyer filed a motion to compel PaineWebber to produce all documents in this file that had been withheld as privileged, about seventy of which were not previously listed on the privilege log. Zinsmeyer later limited this request to twelve documents. The panel ordered those twelve produced for *in camera* review.

After the arbitration, Zinsmeyer's attorneys obtained many of the documents withheld as privileged when the district court rejected PaineWebber's claims of privilege in unrelated investor litigation. Zinsmeyer then argued that the arbitrators' award should be vacated because PaineWebber hid relevant documents through its

claims of privilege. The district court agreed. Without addressing the underlying issues of privilege, the court concluded that the arbitration award was "procured by . . . undue means" within the meaning of 9 U.S.C. § 10(a)(1) because PaineWebber hid four documents from discovery by not fully or accurately describing them in its privilege log. The court further concluded that the documents were relevant to Zinsmeyer's claims and "their absence could certainly have impacted the decision making process of the arbitrators." Finally, the court vacated the award as to Witter, as well as PaineWebber and Reik, because "the integrity of the judicial process will not permit Witter to benefit from these actions of PaineWebber." These appeals followed.

## II.

Judicial review of arbitration decisions is limited. For the most part, courts may vacate an arbitration award only for the reasons set forth in the Arbitration Act. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942 (1995). The statute provides that a reviewing court may vacate an award that was "procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). There was no corruption or fraud in this case. The issue is whether PaineWebber procured the favorable arbitration award by "undue means" given the manner in which it claimed that certain documents were privileged from discovery in the arbitration proceedings.

**A.** The term "undue means" must be read in conjunction with the words "fraud" and "corruption" that precede it in the statute. See Drayer v. Krasner, 572 F.2d 348, 352 (2d Cir.), cert. denied, 436 U.S. 948 (1978). Consistent with the plain meaning of fraud and corruption, and with the limited scope of judicial review of arbitration awards, other circuits have uniformly construed the term undue means as requiring proof of intentional misconduct. See American Postal Workers Union, AFL-CIO v. United States Postal Serv., 52 F.3d 359, 362 (D.C. Cir. 1995) (undue means limited to conduct "equivalent in gravity to corruption or fraud, such as a physical threat to an arbitrator"); A.G. Edwards & Sons, Inc. v. McCollough, 967 F.2d 1401, 1403 (9th Cir.

1992) (undue means "connotes behavior that is immoral if not illegal"), cert. denied, 506 U.S. 1050 (1993); Shearson Hayden Stone, Inc. v. Liang, 493 F. Supp. 104, 108 (N.D. Ill. 1980) ("'undue means' requires some type of bad faith in the procurement of the award"), aff'd, 653 F.2d 310 (7th Cir. 1981). Undue means does not include "sloppy or overzealous lawyering." Edwards, 967 F.2d at 1403. In an unreported case, the Sixth Circuit applied this strict standard in rejecting a claim that a party used undue means to prevail in a discovery dispute before the arbitrators. See Pontiac Trail Medical Clinic, P.C. v. PaineWebber, Inc., 1 F.3d 1241, 1993 WL 288301 at *5 (6th Cir. July 29, 1993). We agree with those decisions.

**B.** To put the issue of undue means in this case in proper perspective, we must consider the nature of a discovery dispute over allegedly privileged documents. The attorney/client privilege is based upon the principle "that sound legal advice or advocacy . . . depends upon the lawyer's being fully informed by the client." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Upjohn involved a corporate counsel's internal investigation of possible illegal payments to foreign government officials. The Supreme Court confirmed that the privilege applies broadly to communications made by corporate employees to counsel to secure legal advice from counsel. Id. at 394. We have likewise applied the privilege to communications to and from corporate attorneys investigating their client's possible violations of federal securities law. See Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 600-01 (8th Cir. 1977), followed in In re Bieter Co., 16 F.3d 929, 935-36 (8th Cir. 1994). These cases confirm that PaineWebber had a reasonable basis for asserting that the attorney/client privilege, and perhaps the work product doctrine, protected from discovery in the arbitration at least some internal communications to and from the PaineWebber attorneys who conducted the investigation of Reik's trading activities.

The attorney/client privilege is waived by the voluntary disclosure of privileged communications, and courts typically apply such a waiver to all communications on the same subject matter. See United States v. Workman, 138 F.3d 1261, 1263 (8th Cir.

-5-

1998). Thus, a party wishing to invoke the privilege in responding to document discovery must assert it as to all documents to which it may apply. Whether a document is in fact privileged can be a difficult question, and if the parties engaging in discovery cannot resolve the issue informally, it must be decided by the tribunal conducting the proceeding in which the privilege has been asserted. The party seeking discovery cannot see the allegedly privileged documents -- that might waive the privilege -- so the dispute is usually resolved by submitting them to the tribunal *in camera*. This is an awkward, time-consuming process. To make the process work, and to encourage parties to minimize the number of documents that must be reviewed *in camera*, most tribunals require the party asserting the privilege to provide the party seeking discovery with a list or log that describes the document without disclosing the allegedly privileged communications it contains. This practice is now codified in the Federal Rules of Civil Procedure, <u>see</u> Rule 26(b)(5) (1993), and it was used by the panel of arbitrators in this case.

Certain inherent aspects of this privileged document process are relevant to the "undue means" issue before us. When a party claims that certain documents are privileged and provides a list or log of those documents, the other party, the one seeking discovery, must take the initiative, for if the party seeking discovery does not press for *in camera* review of a particular document, the process ends with the claim of privilege *de facto* upheld. Because privilege disputes can only be resolved by *in camera* review of a document, formal resolution of such disputes is tedious and difficult. When many documents are at issue, the tribunal will of course want the party seeking discovery to limit the number it challenges. The tribunal ultimately decides what information must be disclosed on a privileged document log. Because that log is the basis upon which the party seeking discovery decides whether to request *in camera* review of a particular document, when the disclosure is inadequate -- for example, PaineWebber's use of blue sheets to replace allegedly privileged documents in the compliance officer's file -- the party seeking discovery must either demand *in camera* review of all documents, or ask the tribunal to require greater disclosure on the log.

While this awkward process may seem to present the opportunity for a party to "hide" damaging documents by providing a deceptive or inaccurate privileged document log, inadequacies in the log will become apparent to the tribunal if the party seeking discovery demands *in camera* review of some documents, and stiff sanctions may be imposed on a party whose log is found to be inaccurate or dishonest.

**C.** Given the importance of the attorney/client privilege and the work product doctrine, and the realities of a discovery dispute over allegedly privileged documents, we disagree with the district court's decision to vacate the arbitration award for three distinct reasons.

*First*, we conclude that PaineWebber did not employ "undue means" in asserting that some of its documents were privileged. In response to Zinsmeyer's discovery requests, PaineWebber individually identified each allegedly privileged document, listing the vast majority of them in its 347-page log, and showing with a blue sheet where others appeared in the compliance officer's file. This gave Zinsmeyer a basis for determining whether to request that some or all of these documents be submitted for *in camera* review of the asserted privilege.

The district court nonetheless concluded that PaineWebber's handling of four documents constituted undue means:

• The first document was a memorandum to Mitchell Hutchins's general counsel from a staff attorney recommending that restrictions be imposed on Reik's management of a closed-end mutual fund (not the Zinsmeyer account). Both this final document and an earlier draft were listed on PaineWebber's privilege log, described as documents regarding "Reik Compliance Issues." The draft was submitted for *in camera* review, and the arbitrators upheld PaineWebber's claim of privilege. Zinsmeyer did not request *in camera* review of the final memorandum. The district court concluded that

-7-

PaineWebber's failure to disclose the relationship between the two documents constituted undue means.

• The second document contained handwritten notes of a meeting between the compliance officer and three Mitchell Hutchins attorneys. PaineWebber listed this document on the log, attributing the notes to the attorneys, whose names appeared on the document. In fact, the notes were taken by the compliance officer, whose name did not appear on the document. Zinsmeyer did not request *in camera* review of this document. The court concluded this inaccuracy constituted undue means.

• The third document was a file memorandum by PaineWebber, Inc.'s general counsel describing a telephone conversation in which he told a Witter executive there was "reason to believe Reik was primarily responsible" for "millions of dollars of potential losses" to PaineWebber customers. This document was in the compliance officer's file. It was not listed on the privilege log, but a second file memorandum prepared by the same attorney on the same day regarding a conversation with the same person was listed on the log. The court concluded that not listing the document in the log was undue means.

• The fourth document was a memorandum from PaineWebber's director of compliance and Mitchell Hutchins's general counsel to PaineWebber, Inc.'s general counsel. The document was listed and correctly described on the privilege log; Zinsmeyer did not request *in camera* review. Two earlier drafts of the memorandum were produced by PaineWebber. During the arbitration hearing, while questioning the author of the drafts, counsel for Zinsmeyer asked opposing counsel whether a complete version of the draft existed. PaineWebber's counsel responded, "[t]hat is the only document that exists in the files . . . you have everything that exists in our client's file." The district court concluded this response was undue means.

On their face, these mistakes do not reflect the intentional misconduct that constitutes "undue means" under 9 U.S.C. § 10(a)(1). They are the kinds of errors and oversights that are apt to attend the process of claiming privilege for a large group of corporate documents. PaineWebber has offered innocent explanations for its handling of each document. It is improper to infer nefarious intent or bad faith from what appear to be ordinary discovery errors. The district court held no evidentiary hearing, and thus there is no proof that PaineWebber's attorneys intentionally abused the process for asserting claims of privilege. Zinsmeyer was not particularly diligent or aggressive in challenging PaineWebber's claims of privilege to the arbitrators.[1]  In these circumstances, the court's undue means conclusions cannot be upheld.

*Second*, an arbitration award may be vacated if it was "procured by" undue means. In other words, there must be some causal relation between the undue means and the arbitration award. See Edwards, 967 F.2d at 1403 ("the statute requires a showing that the undue means caused the award to be given"); Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas, 915 F.2d 1017, 1022 (5th Cir. 1990) (there must be a "nexus" between the misconduct and the arbitrator's decision); Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1383 (11th Cir. 1988) (fraud must "materially relate[] to an issue in the arbitration"); see also BLACK'S LAW

---

[1]Three of the documents were listed on PaineWebber's privilege log, and the fourth was replaced in the compliance officer's file with a blue sheet bearing its Bates stamp number. If Zinsmeyer believed that the descriptions on the privilege log were inadequate, or that documents replaced with a blue sheet should be described, it could have asked the panel to order PaineWebber to supplement its log and pressed for a ruling on that request. Compare Gingiss Int'l, Inc. v. Bormet, 58 F.3d 328, 333 (7th Cir. 1995).

U.S. 427, 436 (1953), overruled on other grounds, Rodriguez De Quijas v. Shearson/American Express, Inc., 490 U.S. 477 (1989).  Thus, eliminating the need to prove a causal connection whenever an award is unexplained would effectively read the "procured by" requirement out of the statute, and would be inconsistent with the limited nature of judicial review of arbitration awards.  See Edwards, 967 F.2d at 1403.

Zinsmeyer further argues that there is proof of the requisite causal connection because PaineWebber hid relevant evidence by undue means, namely, the manner in which PaineWebber disclosed the existence of four *allegedly* privileged documents. Assuming for the sake of argument that PaineWebber's errors constituted undue means, we will further assume that, absent those errors, Zinsmeyer would have included the four documents in the group submitted to the arbitration panel for *in camera* review. But the documents would not have been produced, and therefore would not have been available as evidence, unless the arbitrators overruled PaineWebber's claims of privilege.  Thus, a fatal flaw in Zinsmeyer's argument, and the district court's decision, is the complete failure to address the merits of the privilege issues.  The arbitrators upheld PaineWebber's claims of privilege on most documents submitted for *in camera* review, and Zinsmeyer has not challenged those rulings.  On this record, to give the arbitration award the deference it is due, we must assume that claims of privilege not submitted to the panel for *in camera* review would also have been upheld.  Therefore, Zinsmeyer has failed to prove that PaineWebber's errors in the privileged document process, even if intentional and therefore a form of undue means, "procured" the arbitration award.

*Third*, a related but distinct flaw in Zinsmeyer's argument is its failure to explain how PaineWebber's alleged undue means affected the arbitration hearing record. Assuming now that the arbitrators would have overruled PaineWebber's claims of privilege had the four documents been submitted for *in camera* review, that does not mean that new material evidence would have found its way into the hearing record. "The privilege only protects disclosure of communications; it does not protect

disclosure of the underlying facts by those who communicated with the attorney." Upjohn, 449 U.S. at 395. The documents appear to add little to the evidence presented during the thirty-eight-day hearing regarding Reik's trading activities and PaineWebber's investigation of those activities.

For example, one of the four documents consisted of notes by a PaineWebber attorney of his phone conversation with a Witter executive. Zinsmeyer argues that it would have called the Witter executive as an adverse witness if the document had been produced. But the phone conversation, which involved employees of two independent investment firms, was not privileged (though the attorney's file notes might have been properly listed as privileged if they included work product). PaineWebber disclosed the *fact* of the conversation on its privilege log. Thus, it was not PaineWebber's alleged undue means that kept the substance of the conversation out of evidence, it was Zinsmeyer's lack of interest in obtaining and presenting that evidence.

Zinsmeyer's brief effectively demonstrates that its attorneys in the arbitration would have found the four documents very interesting. But Zinsmeyer fails to show how production of those four documents would have resulted in additional *facts* being presented to the arbitration panel. For this reason, too, Zinsmeyer failed to prove that the alleged undue means procured the arbitrators' award.

For each of the foregoing reasons, the district court erred in vacating the arbitration award in favor of the PaineWebber companies, Witter, and Reik on the ground that the award was procured by undue means.

### III.

Zinsmeyer argues that even if the arbitration award was not procured by undue means, it must be vacated because of the arbitrators' "bias and misconduct." Zinsmeyer points to comments by the arbitrators that the hearing was taking too long,

that it was interfering with their practices, and that they were relatively underpaid for this work. Zinsmeyer argues that this attitude caused the arbitrators to deny Zinsmeyer's motions for continuances to pursue discovery issues, thereby playing into PaineWebber's strategy to stonewall discovery and to rush the proceedings to judgment before its bad documents came to light. Zinsmeyer does not challenge the merits of the arbitrators' procedural rulings. Rather, it argues the award should be vacated because of "evident partiality or corruption in the arbitrators." 9 U.S.C. § 10(a)(2). Zinsmeyer waived this contention by failing to raise it to the arbitrators. See Kiernan v. Piper Jaffray Companies, Inc., 137 F.3d 588, 593 (8th Cir. 1998); Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co., 866 F.2d 11, 13 (1st Cir. 1989).

In addition, when viewed in the light of our limited power to review arbitration awards, the argument borders on the frivolous. Challenges to arbitration awards based on partiality generally involve claims that the arbitrators failed to disclose relationships that "create an impression of possible bias." Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 51 F.3d 157, 159 (8th Cir. 1995), citing Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 149 (1968). Here, no such relationship is alleged, and there is no evidence the arbitrators had any financial or personal interest in the outcome of the arbitration. Moreover, nothing in the arbitrators' comments evidences partiality to one side or the other. Read in context, the comments reflect an understandable desire to move the arbitration along, which, far from demonstrating bias, is consistent with the general policies underlying arbitration. See Ballantine Books, Inc. v. Capital Distrib. Co., 302 F.2d 17, 21 (2d Cir. 1962) ("an arbitrator should . . . expedite the proceedings . . . since among the virtues of arbitration . . . are speed and informality").

The judgment of the district court is reversed and the case is remanded with directions to grant appellants' motions to confirm the award.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.